**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NORMAN D. CLAIBORNE** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 19-3011** |
| **v.** | : | |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION ATUHORITY, and** | : | |
| **TIMOTHY DORETY** | : | |
| | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                   **November 15, 2021**

## <u>MEMORANDUM</u>

This is an action alleging race discrimination and retaliation, brought by an African American man who worked for the Southeastern Pennsylvania Transportation Authority ("SEPTA") for 10 years before being fired in 2015. Plaintiff Norman Claiborne claims he was not given the same opportunities for promotion as white employees, suffered retaliation after he filed a charge of discrimination, and was ultimately terminated for complaining of discrimination. Plaintiff has been given wide latitude as to the scope of discovery and multiple extensions of time to develop his claims. With the record now complete, he cannot prove that he was passed over for any open positions. As to his termination, there is substantial evidence of repeated violations of SEPTA's attendance policy, leading to his termination and subsequent reinstatement three times during his employment, including a reinstatement after violation of a last clear chance agreement negotiated by Plaintiff's union. Evidence of racial animus is minimal, and given Plaintiff's history,

no reasonable jury could find his termination a pretext for racial discrimination.  I must therefore grant Defendants' pending motion for summary judgment.

## I.     Factual and Procedural Background

Plaintiff employee, Norman D. Claiborne, brings claims for race discrimination and retaliation under Title VII, 42 U.S.C. §2000e-2(a).   Plaintiff also asserts claims under the Pennsylvania Human Relations Act (PHRA), 43 PA. STAT. §§ 951 *et seq* and the Philadelphia Fair Practices Ordinance (PFPO), Phila. Code §9-110 I *et seq.*[1]  *See SAC* ¶¶ 34, 71, 84, 89.

Mr. Claiborne began working as a Maintenance Custodian Driver for SEPTA in 2005.  *See* Claiborne Dep. 20:10-13, Nov. 10, 2021, ECF 52-1.  He was assigned to the Frankford Depot, where he cleaned SEPTA facilities, buses, and stations, and drove to various SEPTA locations in and around Philadelphia.  *Id.* at 20:10-13.

After working at SEPTA for about four years, Mr. Claiborne sought a higher ranked and better paid job than that of a Maintenance Custodian Driver.  *Id.* at 35:1-7.  In 2009, he took and passed written examinations to qualify for the position of General Helper/Fueler.  *Id.* at 34:20-35:7; 38:24-39:1.  As both parties agree, between 2010 and 2014, there were no open Fueler positions.  *See* Def.'s Reply Mot. Summ. J., ECF 53, at 7-8; Claiborne Dep. 180:8-21.  SEPTA claims that there were no open positions because Tim Dorety, the Director of Frankford Depot's Maintenance Department and Plaintiff's Supervisor, had been advised to decrease the headcount at Frankford Depot because it was overstaffed.  Def.'s Mot. Summ. J., ECF 47-1, at 8.  Mr. Claiborne has a different explanation.  The gist of his account is that African American SEPTA employees are regularly informed that no positions are available or denied positions that white

---

[1] Claiborne originally brought claims under Section 1981 and Section 1983. Claiborne withdrew those claims and therefore, I do not consider them. *See* Pl.'s Opp'n Def.'s Mot. Summ. J., ECF 52, at 23.

employees receive.  *See* Claiborne Dep. 48:17-49:9; Marcel Gibson Dep. 27:17-28:12, Nov. 19, 2020, ECF 52-6.  Claiborne remained at Frankford Depot in the position of Maintenance Custodian Driver until his final termination in 2015.

Claiborne alleges that throughout his employment, SEPTA promoted a racially discriminatory work environment.  SAC ¶¶14-18.

### a.   Disciplinary Violations Between 2008 and 2012

Throughout his 10-year employment at SEPTA, Mr. Claiborne was a member of the Transport Workers Union of Philadelphia, Local 234, which negotiates collective bargaining agreements (CBAs) on behalf of union members and represents union members in disciplinary and grievance proceedings.  Claiborne Dep. 27:24-28:21; SAC ¶¶12, 13.  The CBA's attendance policy includes a point system where employees receive points for every disciplinary infraction.[2]  *See* Def.'s Mot. Summ.J. Appx. A at 0008, 0176-0178, ECF 47-1.  When an employee receives 15 disciplinary points, SEPTA is required to provide that employee with notice, in writing, of the points assessed against him.  *Id.* at 0176-0178.  When an employee receives 20 disciplinary points, he is on "discipline status" and subject to progressive discipline.[3]  *Id.*  The first time an employee reaches or exceeds 20 points, he receives a one-day administrative suspension.  *Id.*  The second time, he receives a five-day suspension. *Id.* The third time, he can be terminated.  *Id.*  The imposition of progressive discipline reduces the employee's point total by 10.  *Id.* at 0179.

The parties do not dispute that throughout Mr. Claiborne's employment as a Maintenance Custodian Driver, he accrued disciplinary points for violating SEPTA policy.  In 2008, a

---

[2] The CBA provides a two-point reduction for each month that an employee does not violate the attendance policy; after five months, the reduction is increased to three points for each month that the employee does not violate the attendance policy.  Def.'s Mot. Summ.J. Appx. A at 0008, 0176-0178.

[3] Depending upon years of service, a higher number of points may be required before discipline is imposed.

maintenance manager found Claiborne sleeping on the job, and SEPTA recommended that he be terminated. *See* Claiborne Dep. 82:1-18; Def.'s Mot. Summ. J. Appx. A at 0182. After negotiation between SEPTA and the Union, who did not dispute the factual allegations, the parties entered into a settlement whereby Claiborne was reinstated, and the intervening time between his discharge and reinstatement served as a disciplinary suspension. *Id.* at 0183.

On three occasions between 2010 and 2012, Claiborne received written notice from SEPTA that he had 15 points levied against him. On all three of these occasions, despite receiving warnings from SEPTA, he then accrued more points and crossed the 20-point threshold. On the first occasion, he received a one-day administrative suspension and his points were reduced by 10. *See* Claiborne Dep. 96:1-5; Def.'s Mot. Summ. J. Appx. A at 0184, 0186-0187. On the second occasion, he received a five-day administrative suspension and his attendance points were again reduced by 10. *See* Claiborne Dep. 96:6-99:15; Def.'s Mot. Summ. J. Appx. A at 0184. On the third occasion, Claiborne was subject to termination in keeping with SEPTA's discipline policy, as he had received 22 attendance points[4] and had been suspended twice. *See* Claiborne Dep. 99:16-103:15; Def.'s Mot. Summ. J. Appx. A at 0194.

The Union filed a grievance protesting Claiborne's termination. Def.'s Mot. Summ. J. Appx. A at 0194. There is no dispute that SEPTA correctly calculated Claiborne's attendance points. *See* Claiborne Dep. 104:1-105:23. After negotiation with the Union, SEPTA entered into a Work Resumption "Last Chance Agreement" specifying that after a one-day suspension, Claiborne would return to work and be placed on a one year probationary period, beginning on January 10, 2013. Def.'s Mot. Summ. J. Appx. A at 0195-0196. According to the agreement,

---

[4] Given that Claiborne had worked for SEPTA for more than five years, his threshold for termination had increased to 22 points. This is in accordance with SEPTA's policy that the 20-point threshold for discharge is increased by two points for every five years of service. Def.'s Mot. Summ. J. Appx. A at 0176-0178.

should Claiborne be "charged with committing any infraction for which discipline is justified, he [would] be subject to an immediate discharge." *Id.* The document further specified that the last step discipline would remain on his record for 730 days, and throughout his SEPTA career, he could receive only one last chance. *Id;* Claiborne Dep. 106:12-15.

### b. Claiborne's Return Following Suspension

Per the terms of his Last Change Agreement, Claiborne returned to work after his one-day suspension on March 27, 2013. Def.'s Mot. Summ. J. Appx. A at 0195-0196. For nearly a year, there were no reported issues between Claiborne and SEPTA. Then, on February 13, 2014, Claiborne was scheduled to begin work 7:30 am. That morning, he called the Frankford Depot to report that he was having trouble getting to work because of a major snowstorm. He was informed via telephone to "keep coming" to work. Claiborne Dep.108:2-109:18. There is no dispute that after this call, Claiborne did not show up for work, nor did he again contact the Frankford Depot. *Id.* More than two hours after Mr. Claiborne was scheduled to begin his shift, at 10:00 am, SEPTA stopped running its services due to the weather. *Id.* at 114:5-8. The following day, Claiborne received an Absence without Leave (AWOL) report and 10 disciplinary points for missing work, bringing his total attendance points to 24 and triggering his termination. *Id.* at 106:22-24. As a result, Claiborne was terminated. *Id.* at 121:2-5.

After Claiborne was terminated, the Union sought his reinstatement. Def.'s Mot. Summ. J. Appx. A at 0197-0198. Among its arguments, the Union asserted that because Mr. Claiborne had contacted the Maintenance Manager to report that he was having trouble getting to work due to the extreme weather, he should not have been considered AWOL. *Id.* at 0197.

Following negotiation between the Union and SEPTA, the parties reached a settlement agreement on September 15, 2014. Def.'s Mot. Summ. J. Appx. A at 0199. The terms included

that Mr. Claiborne would be reinstated, he would receive half back pay for the time during which he was not employed, the AWOL and 10 disciplinary points would be removed from his record, and he would receive a two-point attendance credit.  *Id.* at 0199-2000; Claiborne Dep. 128:13-131:3.

### c.   Claiborne's Termination & Lawsuit

On October 6, 2014, Claiborne returned to work.  Claiborne Dep. 131:18-21.  When asked whether he had subsequent attendance issues, he admitted, "[m]aybe I did."  *Id.* at 132:7-10.  On October 22, 2014, he received four disciplinary points for missing work, bringing up his total disciplinary points from 14 to 18.  Claiborne Dep. 132:13-133:4; Def.'s Mot. Summ. J. Appx. A at 0203.   On November 10, 2014, Claiborne again arrived late to work and received four disciplinary points.  Claiborne Dep. at 133:12-138:18; Def.'s Mot. Summ. J. Appx. A at 0206. SEPTA moved to discharge his employment because he had reached the 22 point threshold.[5] Def.'s Mot. Summ. J. Appx. A at 0206 – 0207. Although the Union initially grieved Mr. Claiborne's termination, the Union ultimately did not file for arbitration, and on February 11, 2015, at a Labor Relations Step hearing, SEPTA found Mr. Claiborne's termination to be proper. Claiborne Dep. 141:10-24, Def.'s Mot. Summ. J. Appx. A at 0207-0208.  Claiborne concedes that

---

[5] Mr. Claiborne testified that he could not remember whether he arrived late to work on November 10, 2014.  When provided with a copy of a document listing his disciplinary infraction and the disciplinary points levied against him on that date, Mr. Claiborne testified that his signature was not on the document, and therefore could not confirm whether he was late on the day in question.  Although he does not specifically admit that he was late on November 10, 2014, he does concede that SEPTA's reason for terminating him was due to the fact he accumulated too many attendance points.  Claiborne Dep. 133:12-138:18; Def.'s Mot. Summ. J. Appx. A at 0206.

the Union did not file for arbitration because it believed it may have lost.  *See* Claiborne Dep. at 141:11-142:4.

After he received the AWOL violation, Plaintiff filed a complaint with the Pennsylvania Human Rights Commission (PHRC) and the Equal Opportunity Commission in 2014, alleging race discrimination.  *See* Pl.'s Opp'n Def.'s Mot. Summ.J. ECF 52 at 7; Claiborne Dep. 146:17-23, 147:13-23.  Claiborne filed his first complaint with this court on February 12, 2020.

It should be noted that Plaintiff  received three extensions of  the discovery deadline to develop his claims., and SEPTA was at one point ordered to produce notes of internal investigations concerning allegations of discrimination by other employees. ECF 46.

## II.    Legal Standard

This motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion

Because a reasonable juror could not find in Mr. Claiborne's favor, Defendant's motion for summary judgment must be granted in full.

### A. Claiborne's Discrimination Claims

Title VII forbids an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race." 42 U.S.C. §2000e-2(a)(1).

In the absence of direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies to claims brought under Title VII, the PHRA, and the PFPO.  *See McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (internal citations omitted) (applying the same framework to claims brought

under Title VII and the PHRA); *Vandergrift v. City of Phila.*, 228 F. Supp. 3d 464, 486 n. 206 (E.D. Pa. 2017) (quoting *Fagleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d. Cir. 2002)) (analyzing claims under the PFPO under the same framework as Title VII and PHRA claims).

Under *McDonnell Douglas*'s three-step framework, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) if he does, the employer must give a legitimate reason for its conduct; and (3) if the employer meets its burden, the plaintiff must show the employer's proferred reason is pretextual. Jones, 796 F.3d at 325-26. I take each step-in turn with respect to Claiborne's claims that SEPTA discriminated against him on the basis of race by 1) failing to promote him and 2) terminating him.

### i. Failure to Promote Claim: Plaintiff Cannot Establish *Prima Facie* Case

To establish a *prima facie* case of discrimination based on a failure to promote claim under Title VII, a plaintiff must show that he (i) belongs to a racial minority; (ii) applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. 42 U.S.C.A. § 2000e et seq., *McDonell Douglas Corp.*, 411 U.S. at 802. The record does not support

a conclusion that there were open and available positions for which Mr. Claiborne applied,[6] and Plaintiff's claim therefore fails.

Plaintiff alleges that he applied for a Fueler position in December 2013, which would have offered a higher salary and title than his position as Maintenance Custodian driver.[7]  *See SAC* ¶¶22, 23.  However, a review of the record makes clear that Mr. Claiborne did not in fact apply for an open Fueler position, but instead signed up for a training opportunity.[8]  *See* Claiborne Dep. 59:4 – 60:5.  Claiborne even concedes that "[b]etween '10 and '14, there were no open positions" for Fueler, the position for which he was qualified. *Id.* at 180:8-21.  As such, Mr. Claiborne does not meet the second factor required to prove a *prima facie* case of discrimination – that he applied for a job for which the employer was seeking applicants.  Under *McDonnell Douglas*, an employee must prove an open position. 411 at 802. *See also Exum v. U.S. Olympic Comm*, 389 F.3d 1130, 1137 (3d Cir. 2004) ("An employer's failure to promote a plaintiff to a non-existent position is not enough to support a presumption of intentional racial discrimination.").

The record does raise a question as to how SEPTA approaches internal hiring, and specifically whether employees had to apply for open positions to be promoted.  Claiborne's

---

[6] Although Mr. Claiborne also alleges that he also applied for three open positions for 3rd Class Mechanic, a position for which he was qualified, his PHRC Complaint and EEOC Complaint only discuss the Fueler position, so my analysis is limited to that position.  *Clarkson v. SEPTA*, 700 F. App'x 111, 114 (3d Cir. 2017).

[7] Claiborne originally brought claims under Section 1981 and Section 1983.  Claiborne withdrew those claims and therefore, I do not consider them.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 23.

[8] In his complaint, Plaintiff Claiborne alleges that in December 2013, Defendant Dorety "posted a vacancy for the position of Fueler and provided a sheet for applicants to sign if they were interested in the position" but after Claiborne added his name to a list of white applicants, Dorety "advised him the position was no longer available."  *See SAC* ¶¶22–25.  In his deposition, however, Mr. Claiborne testified that he did not sign up for a job posting but instead for a training opportunity.  "[The posting was] a training opportunity" that Dorety "snatched…down."  Claiborne Dep. 59:4 – 60:5.

testimony suggests that SEPTA did not have a formal application process for internal promotions. Claiborne testified that he "just had to show [his] paperwork…they never told you to apply for any job." Claiborne Dep. 44:7-9.   According to Claiborne, SEPTA employees would indicate their interest in a position and after passing the requisite test, be promoted to that position. *Id.* at 44:9-18.  Yet, SEPTA's seemingly unusual internal hiring processes do not save Claiborne's argument. It ultimately does not matter whether Mr. Claiborne had to formally apply for a promotion, because the record clearly indicates that there were no open positions for which he was qualified to be promoted.

The other evidence that Mr. Claiborne offers for his failure to promote claim is similarly lacking.  For instance, Mr. Claiborne attempts to establish race discrimination based on a failure to promote by arguing that Rich Murphy, a more junior white employee, was promoted ahead of him.  By itself, this does not suffice. The Court of Appeals has cautioned against "selectively choos[ing] a comparator," holding (in the age discrimination context) that a "decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645-46 (3d Cir. 1998).  More importantly, Mr. Claiborne fails to provide crucial details—such as the timeline for Mr. Murphy's promotion or his credentials—as a basis upon which a reasonable juror could compare their treatment.  *See* Claiborne Dep. 213:18-214:5.

And I cannot rely on the testimony of SEPTA employees who, in depositions, reported that *others* had told them that African American employees were not promoted or were falsely informed that no openings were available, because such testimony would be inadmissible hearsay.[9]

---

[9] *See* Gibson Dep. 28:6-9 ("When it was time for these guys to get promoted, they were either denied or told that there were no positions or openings available"); Tomlinson Dep. 15:2-6, March 30, 2021, ECF 52-4 ("I heard Norm complain about [not being promoted].").

For purposes of summary judgment, a court may only consider hearsay statements that would be capable of admission at trial. S*telwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1275 n. 17 (3d Cir. 1995). As such, I find no inference of discrimination with respect to the failure to promote Mr. Claiborne to the position of Fueler.

### ii. Termination Claim: Plaintiff Cannot Establish Pretext

#### a. Prima Facie Case

To establish a *prima facie* case of termination based on race discrimination, a plaintiff must show that (1) he belongs to a protected class, (2) he is qualified for the position, (3) he is subject to an adverse employment action despite being qualified, and (4) the circumstances support an inference of discrimination. *McDonnell Douglas Corp,* 411 U.S. at 802-03, *Sarullo v. U.S. Postal Serv.*, 352 .3d 789, 797 (3d Cir. 2003). Here, I again apply the *McDonnell Douglas* framework to the issue of termination. Because SEPTA concedes the first three elements (with the adverse employment actions being Claiborne's receipt of disciplinary points and his ultimate termination) the only question for me is whether the record supports an inference of discrimination with respect to Claiborne's termination. I find that that some of the evidence supports an inference of discrimination, albeit barely.

Claiborne broadly asserts that SEPTA promotes a racially discriminatory work environment and that his termination was motivated by discrimination. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 24. To support this inference, he asserts a broad range of potentially discriminatory conduct,[10] including differential treatment in overtime assignments, the failure to discipline an employee who used racial slurs, and the closure of a breakroom primarily used by

---

[10] I discuss the evidence in a different order than that presented in Claiborne's brief. Plaintiff's counsel fails to articulate what evidence supports an inference of discrimination and what evidence supports a finding of pretext. As such, I discuss the evidence in the order I believe is relevant to each issue.

African American employees.  Many of these examples rely on vague assertions and do not carry substantial weight.  But there is at least enough to support some inference of discrimination.

First, Mr. Claiborne claims that African American employees receive disproportionately less overtime than white SEPTA employees.  *Id.* at 19-22.  The record includes the testimony of an African American SEPTA employee, Marcel Gibson, who offers the names of five white employees who consistently received overtime, while Tim Dorety denied overtime to Gibson and other African American employees including Claiborne.  *See* Gibson Dep. 20:10-23:23.  Although this raises an inference of discrimination, the evidence is thin.  Claiborne makes virtually no showing that the five white employees were "similarly situated" to Gibson.  *See id; Mandel v. M & Q Packaging Corp*., 706 F.3d 157, 170 (3d Cir. 2013).  Moreover, although Gibson filed a complaint with the state agency about race discrimination in overtime, his case was dismissed because the agency found that he had in fact received 16 hours of overtime.  *See* Gibson Dep. 25:15-20.

The remaining evidence in the record does not bolster Claiborne's claim about discrimination in overtime assignments.  Claiborne argues that mechanics receive overtime to clean the buses at night, a job that is typically performed by the cleaners.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 19-21.  Yet Claiborne provides no statistics or evidence—besides some passing references to white mechanics in the record[11]—to support the proposition that mechanics are disproportionately white, while cleaners are disproportionately Black.  And without this evidence, assertions about the overtime performed by mechanics adds little value to Claiborne's argument.

---

[11] There are instances in the record where Claiborne indicates that at least some of the mechanics are white and some of the cleaners are African American.  For example, Marcel Gibson referenced "the cleaners and African Americans" sitting together and the "white guys, the mechanics, and the HVAC specialists" sitting together, which could be understood to mean that many cleaners are African American and many mechanics and HVAC specialists are white.  *See* Gibson Dep. 42:22-43:4.

But even more importantly, a close review of the record indicates that cleaners are first asked to work overtime cleaning buses, and only if the cleaners are unavailable will mechanics be called in, which is to be expected under a collective bargaining agreement.[12]   Simply put, the record directly contravenes Claiborne's claim.

Claiborne's own testimony is similarly weak and fails to create a genuine issue of material fact.  At his deposition, he testified that he believes he was denied overtime, but was unable to point to specific instances or examples where he was denied overtime.[13]  Plaintiff's vague perception about a culture of discrimination within SEPTA without more could not persuade a reasonable juror that his termination was based on his race.  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 646 (3d Cir. 2015) (a "passing reference to retirement age and [Plaintiff's] own belief that age discrimination occurred do not comprise sufficient evidence that similarly situated, substantially younger employees were more favorably treated, and therefore do not satisfy the fourth element of a *prima facie* case.").

Next, Claiborne asserts that SEPTA fails to discipline and investigate egregious racist conduct. For this proposition, he points to racist comments made by SEPTA employee Ron

---

[12] To support this argument, Claiborne references the testimony of two SEPTA employees, Arthur Hatsfield and Ernie Faults.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 19-20.  But Hatsfield testified that cleaners receive priority in overtime assignments to clean buses, and Faults testified that he did not believe there was discrimination in overtime assignments.  *See* Hatsfield Dep. 16:7-17:7. Jan. 8, 2021, ECF 52-3.  In response to the question, "If the cleaner wants the overtime shift and the mechanic also wants the overtime shift, and the shift is for cleaning buses, who gets the shift?" Hatsfield reported that "[t]he cleaner would get the shift."  *See* Faults Dep. 16:7-17:7. Jan. 7, 2021, ECF 52-2.  In response to the question, "Do you have any knowledge of Caucasians receiving more overtime than African Americans at the Frankford location depot?" Faults responded, "[n]o, I do not."

[13] Claiborne testified that he believed he "received less overtime than a bunch of the Caucasian gentlemen that were [at SEPTA]."  Claiborne Dep. 211:14-16.  He supports this belief by testifying that each week a SEPTA employee, who is unnamed, "would read off a sheet" the names of employees that received overtime. *Id.* at 211:24-212:1.  Claiborne could not provide the names of any employees that received overtime or say if they were cleaners or mechanics.  He offered only that that "all of the gentleman were white." *Id.* at 212:18-19.

DeGrandis, including on two occasions calling a Black employee a monkey, and on a separate occasion, telling a Black employee that he was "sick of your black ass."  Claiborne Dep. 62:1-75:6.  Employees further testified that they do not believe that Mr. DeGrandis was disciplined, and in fact, he was ultimately promoted.  *See* Tomlinson Dep. 11:8-13:23; Gibson Dep. 34:3-37:9.  To be sure, this is racist and derogatory language.  To the extent that SEPTA knew about and failed to discipline DeGrandis, I find that this raises an inference of discrimination.  Still, the evidence is weak: although employees testified that they did not *believe* Mr. DeGrandis was disciplined, the employees did not have personal knowledge about what, if any, discipline was imposed.  *See id.*

Finally, Mr. Claiborne argues that Defendant Dorety's decision to shut down a break room at the Frankford Depot that was primarily used by African Americans raises an inference of discrimination.[14]  The record contains testimony about a break room closure: some employees testify that a break room primarily used by African Americans was shut down.  At the time, SEPTA offered an explanation that "they want[ed] everybody to eat downstairs," and "an employee was up [in the breakroom] sleeping" but the employees nonetheless perceived the decision to be one motivated by racism.  *See* Gibson Dep. 42:5- 44:10, Claiborne Dep. 158:3-164:22.  I conclude that there could be a slight inference of discrimination given that the only break room that was closed was one used primarily by African Americans.  Yet again, this evidence does not get Claiborne far, as it is almost entirely based on the subjective beliefs of employees.  *See Tillman v. Redevelopment Auth.,* No. Civ.A. 12–1505, 2013 WL 5594701, at *8 (E.D. Pa. Oct. 11, 2013) ("A plaintiff's own unsubstantiated, subjective beliefs of suspicions alone would not suffice to

---

[14] Claiborne discusses the closure of the breakroom with respect to his discriminatory termination claim.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. ECF 52 at 22-23.  The record also includes testimony from Claiborne that suggests that SEPTA may have been retaliating against African American employees by closing the breakroom.  *See* Claiborne Dep. 158:3-164:22.  However, it is unclear from the briefing and the record when the breakroom was actually closed.  Mr. Gibson reports that it was closed in July 2014. Gibson Dep. 42:5- 44:10 and Mr. Claiborne reports that it was closed in July 2013.  Claiborne Dep. 158:3.

persuade a rational trier of fact that age [or race] was a factor in the termination decision."); *Howard v. Blalock Elec. Serv., Inc.,* 742 F.Supp.2d 681, 702 (W.D.Pa. 2010) ("An inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action.").

On balance, despite the weakness of Plaintiff's proof, I am willing to assume an inference of discrimination, and now turn to whether SEPTA has offered a legitimate non-discriminatory reason for Claiborne's termination.

### b.   *Legitimate Non-Discriminatory Reason*

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant employer to articulate a legitimate and non-discriminatory reason for taking the adverse employment action. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). This is a "relatively light burden." *Id.*

By any measure, there is ample evidence in the record from which a factfinder could accept SEPTA's articulated reason for terminating Mr. Claiborne. Plaintiff repeatedly violated the no-fault attendance policy negotiated by his Union and SEPTA. On October 23, 2008, Mr. Claiborne was discharged for sleeping on the job, but the Union negotiated reinstatement. Claiborne Dep. 90:16-92:17. Between 2011 and 2012, Mr. Claiborne again—and on three occasions—received disciplinary points and corresponding suspensions for violating the no-fault attendance policy. *See* Claiborne Dep. 96:1-103:15. Still, he was reinstated. He was even reinstated despite a "last clear chance agreement." Claiborne Dep. 106:12-15. And there is evidence that yet again, in October and November 2014, Mr. Claiborne violated the attendance policy. *See* Claiborne Dep.

132:13-133:4, 133:12-138:18.   In short, substantial evidence suggests a non-discriminatory termination.

### c. *Pretext for Intentional Discrimination*

At this stage, "the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's reason was a pretext for intentional discrimination." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008).  To do this, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.  On either count, Claiborne's claims fail.

"To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . ." *Id*. at 765.  Rather, the plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc*., 130 F.3d 1101, 1109 (3d Cir. 1997). Stated differently, Plaintiff must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

To prove that SEPTA's reason for firing him was a pretext for intentional discrimination, Mr. Claiborne asserts that SEPTA regularly uses its point system to discipline African American

employees but not white employees.  SAC ¶¶43-46.  He provides two examples to support this assertion.

First, he argues that on February 13, 2014, white and Black employees alike both called off from work during a major snowstorm but only Black employees faced discipline in the form of an Absence Without Leave (AWOL) writeup[15] and the receipt of disciplinary points.[16]  SAC ¶¶47-57.  A plaintiff may indeed show pretext by demonstrating that "the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class."  *Simpson,* 142 F.3d at 645 (citing *Fuentes,* 32 F.3d at 765).  But Mr. Claiborne has not done this.

At most, Claiborne has alleged his *belief* that white people were not disciplined without citing any evidence.[17]  He seeks to bolster these allegations by providing the testimony of two African American SEPTA employees who agreed that white employees were not disciplined for

---

[15] Claiborne's argument about his February 2014 AWOL could also be used to support a finding of an inference of discrimination and therefore could be viewed as part of the prima facie case.  In line with how Claiborne organizes his argument, I consider it here.

[16] I review the record related to the February 13, 2014 snowstorm and related disciplinary points for the sole purpose of determining whether SEPTA's use of disciplinary points is a pretext for racial discrimination.  I do not review the record to make a hypothetical finding about what would have happened had Claiborne not received the 2014 AWOL and disciplinary points.  Claiborne asserts that "[b]ut for the racially motivated February 2014 AWOL" his disciplinary points would have been reduced each month and he would have remained employed at SEPTA throughout 2014.  In support of his argument, Claiborne points to SEPTA's disciplinary policy that reduces employees' disciplinary points each month an employee has no incident of "non-attendance."  *See* Pl.'s Opp'n Def.'s Mot. Summ. J., ECF 52 at 11.  I reject this argument because Claiborne's Union entered into an agreement for which the disciplinary points from February 2014 AWOL were removed, and he was reinstated following termination.  *See* Pl.'s Sur-Reply Opp'n Def's Mot. Summ. J., ECF 54 at 4.  Further, Claiborne's argument relies on the assumption that he would have no incidents of "non-attendance" and therefore would be eligible for reductions of his disciplinary points each month.

[17] The second amended complaint reads: "Defendants imposed ten (10) points against Plaintiff and seven (7) other African American employees who called out from work on February 13, 2014.  Even though Caucasian employees called out during the February 13th snowstorm, Defendants never issued them an AWOL or otherwise imposed points against them." *SAC ¶¶ 54, 55.*

missing work during the snowstorm.  *See* Hatsfield Dep. 33:2-17; Faults Dep. 30:11-20.  But a review of the record once again reveals that these employees have no personal knowledge on the matter.[18]  As such, this testimony is also inadmissible hearsay, which I may not consider. *Stelwagon.*, 63 F.3d at 1275 n. 17.

Even if I could consider this hearsay evidence, Claiborne has failed to demonstrate that the white employees who were treated more favorably were "similarly situated" to him.  A determination of whether employees are similarly situated takes into account the employees' job titles and responsibilities, the relevant supervisors, and the type of misconduct engaged in. *Mandel.*, 706 F.3d at 170; *Wilcher v. Postmaster General*, 441 Fed. Appx. 879, 882 (3d Cir. 2011) (non-precedential).  Here, Claiborne made no showing that the white employees had the same job title, the same supervisors, and engaged in the same kind of misconduct, i.e. failing to communicate with SEPTA staff and disobeying a specific instruction to "keep coming" to work.

Second, he refers to SEPTA's failure to terminate Carl Sorenson, a white employee who received 35 disciplinary points, as evidence that the disciplinary point system is used to punish African American employees but not white employees.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 12, Claiborne Dep. 176:20-177:14.  But as discussed above, the Court of Appeals has cautioned against "selectively choos[ing] a comparator."  *Simpson*, 142 F.3d at 645-46.  Further, to the extent that Claiborne relies on Sorenson, he has failed to make any showing that Mr. Sorenson was "similarly situated" to him—that is, had been employed for the same number of years and had

---

[18] Defendant incorrectly asserts that the employees who testified "could point to no specific non-African American who was treated more favorably than African American employees."  *See* Def.'s Reply Mot. Summ. J. at 6.  This is not a fair characterization.  At their depositions, Mr. Claiborne, Mr. Hartsfield and Mr. Faults each were able to identify white employees who they believe missed work on the day of the storm but were not disciplined.  *See* Claiborne Dep. 116:3-120:14, Hatsfield Dep. 33:2-17; Faults Dep. 30:11-20.  That said, these witnesses all lacked personal knowledge of the white employees' disciplinary histories and there is no other evidence in the record to corroborate this disparate disciplinary treatment.

already received a "last chance agreement."  Claiborne Dep. 176:20-177:14.  Key to the question of whether employees are similarly situated is whether there are any "differentiating or mitigating circumstances as would distinguish…the employer's treatment of them." *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (non-precedential) (quoting *Radue v. Kimberly-Clark Cop.*, 219 F.3d 612, 617-18 (7th Cr. 2000)) (overruled on other grounds).  And the Defendant has in fact demonstrated that differentiating circumstances do exist: Mr. Sorenson had been employed at SEPTA for longer than Mr. Claiborne and thus had to reach a higher disciplinary point threshold to be eligible for discharge.[19]  *See* Def.'s Sur-Sur-Reply Mot. Summ. J., ECF 55.

For the reasons above, I find no evidence of pretext, and Mr. Claiborne's discrimination claims fail as a matter of law.

### B.  Claiborne's Retaliation Claim

Plaintiff also asserts that he was retaliated against for filing a race discrimination complaint with the Philadelphia Human Rights Commission in 2014 following receipt of the "AWOL" report.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 6-7.  Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3.

To state a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) his employer took adverse action against him and (3) there is a causal link between the protected activity and the adverse action.  *Charlton v. Paramus Bd. Of Ed.*, 25 F.3d 194, 201

---

[19] Sorenson's higher threshold is due to SEPTA's policy that the 20-point threshold for discharge is increased by two points for every five years of service.  *See* Def.'s Mot. Summ.J. Appx. A at 0176.

(3d Cir. 1994).   Here, Claiborne unquestionably engaged in a protected activity by filing a complaint with the PHRC and the EEOC.  And he certainly suffered an adverse employment action when he received discipline points on October 22, 2014 and on November 10, 2014, which ultimately resulted in his termination.   The question before me is whether he was terminated *because* he engaged in protected activity.[20]

A plaintiff may rely on a range of evidence to demonstrate the causal link between the protected activity and the adverse action including by showing temporal proximity that is "unusually suggestive of a retaliatory motive." *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000).

Mr. Claiborne claims that the temporal proximity between his filing of a PHRC report and the discipline charges he received in October and November 2014 was "unusually suggestive" of a retaliatory motive.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J. at 6-7.   But this interpretation of the record is strained.  Plaintiff filed a PHRC charge on September 9, 2014, during a period in which he was not employed at SEPTA.  He was then reinstated by SEPTA on October 6, 2014, which begs the question: why would SEPTA reinstate him if it was motivated to retaliate?  He was disciplined on October 22, 2014 and November 10, 2014, and as discussed above, at least as to the October incident he does not dispute his lateness.  Unlike in *Jalil v. Avdel Corp.*, where the court found that it was unusually suggestive to terminate an employee two days after he filed an EEOC charge, in this case there was a gap of two months between the PHRC charge and the  termination, during which time Claiborne was actually reinstated, and incurred more disciplinary points.   873

---

[20]"[A]t the prima facie stage, a plaintiff need only proffer evidence sufficient to raise the inference that her engagement in a protected activity was the *likely reason* for the adverse employment action, not the but-for reason." *Carvalho-Grevious v. Delaware State University*, 851 F.3d 249, 253 (3d Cir. 2017).

F.32 701, 708 (3d Cir. 1989).  No reasonable juror could find temporal proximity supporting an inference of retaliatory animus.

In further support of his retaliation argument, Plaintiff relies on the testimony of other African American employees who report experiencing retaliatory discipline after complaining about racism.  *See* Gibson Dep, 49:3-50:15; Tomlinson Dep. 26:21-28:12, 29:3-7, 29:13-30:24. The value of such "me too" evidence depends upon "how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Mandel,* 706 F.3d at 167-68 (citing *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 388 (2008)). *See also Barnett*, 35 F.Supp.3d at 22. ("Among the factors relevant to the determination as to whether or not to allow the introduction of 'me too' evidence in employment discrimination cases are whether the alleged discriminatory behavior by the employer is close in time to the events at issue in this case; whether the same decision-makers were involved; whether the witness and the plaintiff were treated in a similar manner; and whether the witness and the plaintiff were otherwise similarly situated.").

As an initial matter, I reject Defendants' argument that the experience of other SEPTA employees has no relevance simply because they are still employed at SEPTA.  An employee can experience discrimination and retaliation and simply decide to "tough it out."  Further, an employee may experience discrimination and retaliation yet  not be fired because they have not reached the point threshold required for termination.

Nonetheless, testimony by other employees here  is vague and couched in generalities.  Mr. Claiborne fails to show that any retaliation faced by other SEPTA employees parallels his situation. Claiborne's record was replete with violations and multiple reinstatements, and because of what must have been exemplary union advocacy, his employment continued.  Given the totality of the

record, and in particular the strong objective basis for termination, a jury could not find a retaliatory discharge.

### C. PHRA and PFPO Claims

Claiborne's claims under the PHRA and the PFPO similarly fail because, as discussed above, they are reviewed under the same burden-shifting analysis brought under Title VII.  *See McDonell Douglas Corp.*, 411 U.S. at 802-03; *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (internal citations omitted);  *Vandergrift v. City of Phila.*, 228 F. Supp. 3d 464, 486 n. 206 (E.D. Pa. 2017) (quoting *Fagleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d. Cir. 2002)).

### VI.   Conclusion

SEPTA's Motion for Summary Judgment will be granted and Claiborne's discrimination and retaliation claims will be dismissed.  An appropriate order follows.

    /s/Gerald Austin McHugh
United States District Judge